T.C. Summary Opinion 2007-56


UNITED STATES TAX COURT


MICHAEL D. AND SUZAN L. STORER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16243-05S.                    Filed April 12, 2007.


Michael D. and Suzan L. Storer, pro sese.

<u>Edward L. Walter</u>, for respondent.


GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in

effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in and penalties to petitioners' Federal income taxes as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2000 | $4,487 | $898 |
| 2001 | $2,832 | $567 |

The issues for decision are whether petitioners' photography activity constituted an activity not engaged in for profit within the meaning of section 183 during the years at issue and whether petitioners are liable for the accuracy-related penalties provided by section 6662 for the years at issue.

## Background

The stipulation of facts and the attached exhibits are incorporated herein by reference. At the time the petition was filed, petitioners resided in Miamisburg, Ohio.

During the years in issue, petitioners were both employed in full-time jobs. Petitioner-husband (Mr. Storer) worked as a repairman for General Motors, Inc., and petitioner-wife (Mrs. Storer) worked as a receptionist and bookkeeper for Harding ESE, Inc. Petitioners earned total wages of $92,639 and $96,191, respectively, during the years in issue.

Mr. Storer developed an affinity for photography as a young person. However, he first started habitually taking and

developing his own photographs sometime in the early 1990s on his physician's advice that he take up a hobby to help him cope with periodic episodes of depression. At that time, Mr. Storer, who holds a high school diploma, was working in the repair shop at General Motors.

Mr. Storer purchased many books on photography and film developing, as well as photography magazines, some film cameras, and film developing equipment. Mr. Storer had not taken any instruction in photography prior to and including the taxable years at issue. Mr. Storer did not have his skills as a photographer or the quality of his photographs analyzed or critiqued, or have his work juried, prior to or during the years at issue.

While he continued to take and develop his own pictures, Mr. Storer became interested in photographic restoration, and he purchased the equipment and supplies necessary to restore old photographs. Sometime in the early 1990s, Mr. Storer first offered photographic restoration services to family members, friends, and co-workers. Around this time, he decided to try selling some framed landscape photographs he had taken and developed from earlier trips to landmarks such as Yosemite National Park. Around this time, petitioners set up a makeshift photography studio and darkroom in the basement of their home.

Starting in the early 1990s, Mrs. Storer assisted her husband with his photographic pursuits by recording his expenses in journals. With an educational background in accounting from the local community college, Mrs. Storer recorded these expenses using the cash basis method of accounting. Mrs. Storer has also prepared State tax documents, including sales tax reports.

In 1993, petitioners engaged a management consultant to assist them in preparing a 5-year projection for turning their photography activity into a business. The management consultant provided petitioners with a series of flexible budgets and projections spanning through 2002. The management company based its projections on the assumption that by the year 2000, petitioners would have $21,200 in gross sales, and that by 2002, petitioners would have $21,500 in gross sales.

Prior to 1993, Mr. Storer had purchased a large amount of "analog" photography and darkroom equipment for the studio and darkroom in the basement of petitioners' home. Between 1993 and 2002, petitioners began to replace their "analog" equipment with new digital cameras, printers, scanners, and the supplies for printing digital photographs; namely, paper and ink cartridges. Petitioners completely dismantled their basement studio and darkroom in the early 2000s. Upon dismantling their basement studio, petitioners set up a "digital darkroom" consisting of a

large table, desk, computer, and bureau in a spare room adjacent to their bedroom.

From 1998 through the years in issue, Mr. Storer suffered a series of health setbacks requiring him to take off substantial time from his job at General Motors.

Petitioners maintained neither a separate bank account for their photography activities nor a separate phone line for customers.  Although petitioners had purchased a separate insurance policy for their cameras and developing equipment in the early 1990s, they combined this policy into their homeowners' insurance in 1999.

In 2001, petitioners made 14 sales transactions.  These sales were made to friends and Mr. Storer's co-workers at General Motors.[1]  The nature of petitioners' sales in 2002 is unknown.

In preparation for trial, petitioner prepared a portfolio of photography brochures, listing prices, and packages.  None of the materials contained in the portfolio were created in or used as marketing during the years in issue.  This portfolio included examples of the types of landscape photographs that Mr. Storer had taken from such places as Yosemite National Park, North Dakota, Washington, Puerto Vallarta, Aruba, and San Juan.  The

---

[1] Petitioners provided a summary of their 2001 invoices. This 3-page summary lists 7 of the 14 buyers by first name only as: "Jim; Hall; Steve; Al @ GM; Gary @ GM; 'Lady' @ GM; Bob @ GM."

portfolio also included wedding photographs and photographs of individuals and pets, some of which are dated from the late 1970s and early 1980s, and none of which were taken during the taxable years in issue. Petitioners attached a business card to the portfolio which reads: "Michael Storer Photographs, 1150 E. Lindsey Ave., Miamisburg, Ohio 45342, Photo Restorations & More." The address and phone number listed on petitioners' card are those of their personal residence.

Beginning with their 1993 Federal income tax return, petitioners included the photography activity on Schedules C, Profit or Loss From Business, of their returns.

Petitioners reported gross receipts and claimed losses from a 7-year period of the photography activity from 1996 through 2002, while maintaining full-time employment, as follows:

| Year | Gross Receipts | Total Expenses | Profit or/(Loss) |
|------|----------------|----------------|------------------|
| 1996 | $1,060 | $14,402 | ($13,342) |
| 1997 | 316 | 13,375 | (13,059) |
| 1998 | 435 | 20,439 | (20,004) |
| 1999 | 1,366 | 15,027 | (13,661) |
| 2000 | 1,474 | 21,421 | (19,947) |
| 2001 | 855 | 16,050 | (15,195) |
| 2002 | 1,575 | 9,586 | (8,011) |
| Totals | $7,081 | $110,300 | ($103,219) |

For the years in issue, petitioners claimed the following deductions on their Schedules C:

| Item | 2000 | 2001 |
|------|------|------|
| Advertising | $153 | $98 |
| Car and truck | 112 | 202 |
| Depreciation | 13,350 | 8,215 |

| | | |
|---|---|---|
| Legal and professional | 265 | 285 |
| Office[2] | 0 | 0 |
| Rent or lease | 0 | 0 |
| Repairs and maintenance | 0 | 0 |
| Supplies | 1,039 | 1,383 |
| Taxes and licenses | 0 | 0 |
| Travel | 0 | 0 |
| Utilities | 0 | 25 |
| Other | 154 | 103 |
| Expenses for business use of home | 6,348 | 5,739 |
| Total expenses | $21,421 | $16,050 |

In the notice of deficiency, respondent disallowed petitioners' claimed Schedule C deductions for expenses on the ground that petitioners were not engaged in a trade or business activity for profit.  However, respondent allowed as additional itemized deductions real estate taxes and mortgage interest included in the computation of expenses of business use of home. In addition, respondent allowed Schedule C expenses to the extent of income reported from the activity.

## Discussion

The parties disagree as to whether petitioners engaged in their Schedule C activity with an objective of making a profit within the meaning of section 183.  Section 183(a) disallows

---

[2] On their Schedules A, Itemized Deductions, petitioners claimed that 44 percent of their home was used as office space. They did not, however, upon request, allow respondent's agent into their home to survey this space, claiming that such a visit would be "unnecessary and unwise."

deductions attributable to an activity not engaged in for profit. Section 183(b) provides two exceptions to this general rule. The first, provided by section 183(b)(1), permits deductions that otherwise would be allowable without regard to whether the activity is engaged in for profit; the second, provided by section 183(b)(2), permits deductions that would be allowable if the activity were engaged in for profit to the extent that the gross income from the activity exceeds the deductions allowable pursuant to section 183(b)(1). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." In general, the Commissioner's determination set forth in the notice of deficiency is presumed correct. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances the burden of proof shifts to respondent. Sec. 7491(a)(1). Petitioners do not contend that section 7491 is applicable in this case, nor did they establish that the burden of proof should shift to respondent.

Petitioners bear the burden of establishing that their photographic activity was engaged in for profit during the taxable years at issue. Rule 142(a). In satisfying this burden, taxpayers must show that they had an actual and honest objective of making a profit from the activity. Dreicer v. Commissioner,

78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayers' expectation, however, need not be a reasonable one. Id. at 644-645; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Whether there is present the requisite intention of engaging in an activity with the objective of making a profit is a question of fact that is to be resolved upon a consideration of all relevant circumstances, with the greatest weight being given to the facts rather than the taxpayers' expression of their intent. Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs. Therefore, irrespective of how ardently petitioners have stressed that they always intended to make a profit from their photography activity, whether or not their activity rose to a level that satisfies their burden rests upon a consideration of all of the relevant factors concerning their activity during the taxable years at issue.

Section 1.183-2(b), Income Tax Regs., sets forth the following nonexclusive list of the relevant facts that we will now consider: (1) The manner is which the taxpayers carry on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that the assets used in the

activity may appreciate in value; (5) the success of the taxpayers in carrying on similar or dissimilar activities; (6) the taxpayers' history of income or loss with respect to the activity; (7) the amount of occasional profits; (8) the financial status of the taxpayers; and (9) whether elements of pleasure or recreation are involved. Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs.

Based on our consideration of these factors and in the light of the copious record in this case, we conclude that petitioners have not demonstrated that their photographic activity was carried on with an actual and honest objective of making a profit in the taxable years at issue. In reaching our conclusion, we view the following elements as being most persuasive:

Manner in Which the Taxpayers Carried On the Activity

We believe that the manner in which petitioners carried on their photography activity does not support a finding that it was engaged in for profit. In 2001, petitioners only made 14 sales and of these, at least one-half were made to buyers identified on petitioners' records by first name only. Several other entries were identified by only the buyer's first name plus the words "at GM."

Petitioners testified that the 14 sales in 2001 were not reflective of their manner of operations because they "actually solicited to hundreds of potential customers" at various craft

and art shows during the years at issue. We note, however, that in a detailed calendar for 2001, which was submitted as an exhibit and on which petitioners testified that they recorded all of the time spent on training, marketing, and sales, there is not one entry of any craft or arts show. There are also no entries showing preparation for any craft or arts shows.

Although petitioners reported sales of $855 in 2001, there is no evidence that petitioners actually made any sales in 2001 or to whom these sales were made.

Petitioners did not use a separate bank account or telephone number for their activity, and the insurance held on all of their photography equipment was incorporated into their homeowner's policy.

Mr. Storer testified that, as one example of the "highly professional nature in which he carried on his business," he only used business cards printed by a commercial printer rather than the type printed on an ink-jet printer "with those little perforations on the sides." Upon examination of the two business cards provided by petitioners with their exhibits, however, it is clear that the cards have both the visible dot-matrix quality akin to those printed on an ink-jet printer as well as perforated edges.

Although petitioners kept very extensive and detailed records of their expenses, we believe that these records were

maintained solely for the purpose of substantiating their considerable losses and not as a means for tracking costs so as to reduce business-related expenses. The extensiveness of the records would be more meaningful if these records illustrated that petitioners were tracking expenses while, at the same time, making a bona fide effort to grow their photography enterprise. These records primarily show us that petitioners were adept at acquiring the latest digital photography technology and supplies. What is conspicuously missing, however, is a same level of extensive detail showing expenses and activities specifically geared at growing the business. For example, petitioners spent thousands of dollars on digital cameras and supplies, yet believed that it was unnecessary to spend more than $250 (which included a $95 ad placed in the back of the local high school yearbook) on the basic staples of marketing a business such as advertisements, a listing in the yellow pages, or brochures. Although petitioners submitted an extensive portfolio of flyers as an exhibit, they admitted that the portfolio was not created until shortly before time of trial. Petitioners continually cite activities such as additional sales made in storefronts, which purportedly occurred in 2003 and 2004. Not only did petitioners not provide any evidence of these activities, but these years are not in issue. The Court is concerned only with petitioners'

activities in 2000 and 2001, and not with what petitioners have or have not done in subsequent years.

Time and Effort Expended by the Taxpayers

The numbers of hours spent cultivating his activity, as testified to by Mr. Storer, is not only dubious but, if accurate, is grossly inverse to the sales resulting from his efforts. Mr. Storer claimed that he spent nearly 1,200 hours working on his activity in 2001, in addition to his full-time position at General Motors. If this claim was accurate, Mr. Storer would have had to spend an average of more than 3 hours a day,[3] every day, on his photography, in addition to his full-time work, commuting to and from his workplace, and eating and sleeping. As evidence of his daily activities, Mr. Storer submitted as an exhibit a pocket calendar for 2001 in which he purportedly handwrote the time he spent on his photography activity each day. Our examination of this calendar has led us to conclude that petitioners' claims as to the time spent on the activity are not accurate.

First, we believe neither that the calendar was made contemporaneous to the dates as recorded nor that it was an accurate accounting of petitioners' time. For support of this conclusion, we look to several instances where the calendar contains entries for dates that simply do not exist.

---

[3] (1,200/365 = 3.29 hours)

Specifically, the first week of September (beginning with Saturday, September 1st), has entries starting on Tuesday of that week (which would have actually been Tuesday, August 28th). The entry for "Wednesday" of this 'added' week reads: "In Focus Bk - 3 hrs." To reconcile the possibility that this "added" day was not the same as the corresponding last Wednesday in August, we turned to the entry for Wednesday, August 28th which reads: "Exposure Bk - 4 hrs." We further note additional "added" days and entries to the first week of the November calendar page that do not correspond to the actual days and entries recorded on the October calendar.[4] Because there is more than one instance of these "added" days, we do not believe that the calendar is an accurate and truthful account of the time spent by petitioners in cultivation of a business.

Mr. Storer stressed that he did not take any vacation, and that "for religious reasons" observed neither any religious nor Federal holidays, which allowed him those days to work on his photography. Mr. Storer testified that he "used [all holidays] to market his business, process orders, and make sales." The 2001 calendar, however, shows no activity recorded on April 15

---

[4] On the November calendar page petitioners "inserted" 2 days at the beginning of the month, a Tuesday and a Wednesday, that did not actually exist. Again, the entries recorded on these "added" days also do not correspond with the entries listed for the last 2 days of October.

(Easter), May 28 (Memorial Day), September 3 (Labor Day), or November 22 (Thanksgiving Day).

Our examination of the entire year's worth of daily entries, moreover, shows that almost 80 percent of Mr. Storer's time was spent either reading the monthly installments of a limited number of photography magazines[5] and books or shopping at retail stores.

Finally, were we to believe that the entries accurately reflect the time petitioners spent cultivating photography into a viable business, the time spent is grossly inverse to the actual sales made in the years at issue.

The Taxpayers' History of Losses and Financial Status

First, since 1996, petitioners' claimed Schedule C business losses have exceeded $13,000 in each year, while their gross receipts from that same time never exceeded $1,600. Petitioners have never earned a profit.

Petitioners cite our decision in Churchman v. Commissioner, 68 T.C. 696, 701 (1977), to support their contention that the years of losses which preceded the years in issue should not dictate our determination of whether their activity in 2000 and 2001 was conducted with the objective of making a profit. As further support, petitioners argue that their losses were offset

---

[5] For example, in January 2001, petitioner spent 14 hours reading "Shutterbug" magazine, 8 hours reading "Outdoor Photography" magazine, and 8 hours shopping at Circuit City and CompUSA.

in the years in issue because they sold a considerable portion of their "analog" equipment while upgrading to newer, digital technology.  Petitioners claim that their losses are further justified by the difficult economic conditions which plagued large "analog" photography businesses, such as Eastman-Kodak, as more consumers switched from "analog" to digital photography.

We do not find credence in petitioners' arguments.  First, petitioners do not claim to be engaged in the business of selling photography equipment but, rather, taking photographs.  Second, although we acknowledge the phenomenal growth in digital photography throughout the past decade, petitioners were not in the business of developing other people's photographs. Petitioners purported to be professional photographers.  The effect of the digital photography boom on businesses such as Eastman-Kodak resulted from consumers' choosing to develop their photographs at home rather than use traditional film developing services.  It did not affect the demand for quality professional photography services for the very types of portraiture and event coverage which petitioners claimed was their focus; namely, weddings, corporate prints, and senior portraits.  Similarly, the boom in home developing did not affect the specialized services that are often the hallmark of professional photographers, such as portrait sittings, albums, restorations, DVDs, and videos. Again, while the phenomenon of digital photography has made home

developing more accessible to amateur consumers, this newfound ability for recreational "photogs" to take and develop their own pictures has not changed the demand for quality, professional photography. If anything, the availability of high-quality digital cameras has made the consumer more astute regarding both resolution and composition aesthetic when selecting a professional photographer. To this end, had petitioners invested more resources into education and training or sought professional evaluation of their skills, we would be more convinced that their activity was engaged in with the objective of making a profit.

Petitioners argue that the income they earned in their respective full-time jobs in 2000 and 2001 is irrelevant because petitioners could not use their wages to pay for any of their photography-related expenses but instead, used credit and gifts from friends and family. Petitioners claim that their wages were almost completely exhausted by their household bills, mortgage, and taxes. With expenses totaling $23,000 in the years in issue, we are doubtful that petitioners did not apply any of their wages to this amount. Moreover, we note that, if petitioners indeed incurred debt of $23,000, the fact that they only took in $2,000 in sales supports our conclusion that petitioners' activity in these 2 years was not engaged in with the objective of making a profit.

Elements of Recreation

In sum, we believe that petitioners engaged in their photography activity for the principal purpose of providing Mr. Storer with the opportunity to take up a pleasurable hobby to reduce his stress and anxiety.  It is evident from the photographs showing the areas in their home used for this activity that petitioners took great care and expense in setting up a pleasant and well-stocked workspace.  Photography, however, is highly subjective, and in great part, the success of a photography business is dependent on both the skill and talent of the photographer and the marketing and reputation cultivated therefrom.  We are perhaps ultimately persuaded by petitioners' decision to forgo any formal training or education in photography in lieu of reading photography and trade magazines, and picture books featuring works by famed landscape photographer Ansel Adams.  While it is beyond our purview to comment on Mr. Storer's ability or potential, we think it unlikely, barring an extraordinary talent, to become Ansel Adams through self-study. Moreover, we believe that Mr. Storer, through educating himself primarily with trade magazines that feature the most current technologies, was compelled to purchase and, ultimately, gratified by his acquisition of extremely expensive equipment. Finally, we note that at the end of petitioners' presentation prepared for the Court, Mr. Storer lamented that he had to

"perform many, menial chores" and "has had to do many forms of marketing including cold calls that can be unpleasant at times." While petitioners claim that they should not be required to suffer as "a prerequisite to deductibility," we cannot help wondering how petitioners engaged in their activity with a profit objective if they were opposed to performing the tasks essential to business success; namely, marketing and sales calls.

Finally, although we concede that on its face, petitioners' photography activity did have some of the characteristics of a business, we find these characteristics insufficient to demonstrate that their activity was carried on for profit.

Therefore, on the basis of all of the evidence in the record, we conclude and hold that petitioners did not conduct their photography-related activity in either 2000 or 2001 with a profit objective within the meaning of section 183. Accordingly, petitioners are not entitled to the deductions claimed on their Schedules C for the years in issue.

<u>Section 6662(a) Penalty</u>

Respondent determined that petitioners are liable for the accuracy-related penalty provided by section 6662(a) for each year in issue. Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment of tax that is attributable to, inter alia, negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable

attempt to comply with the provision of the Internal Revenue Code, including failure to exercise due care or failure to do what a reasonable person would do in the circumstances. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard of the Code or the temporary or final regulations issued pursuant to the Code. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

Section 7491(c) places on the Commissioner the burden of producing evidence showing that it is appropriate to impose any penalty or addition to tax. Once the Commissioner meets that burden, as in the instant case, the taxpayer must produce evidence sufficient to show that the Commissioner's determination is incorrect. Higbee v. Commissioner, 116 T.C. 438, 447 (2001). Petitoners have not produced evidence sufficient to prove that respondent's determination in this case was incorrect.

The accuracy-related penalty does not apply to any portion of an underpayment with respect to which it is shown that there was a reasonable cause and that the taxpayer acted in good faith. Sec. 6664(c)(1). The decision as to whether the taxpayers acted with reasonable cause and in good faith depends upon all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayers' efforts to assess the proper tax liability. Id.

Petitioners contend that they believed in good faith that the expenses they claimed were allowable. Good faith on the part of taxpayers, however, does not always negate negligence. Taxpayers are required to take reasonable steps to determine the law and to comply with it. <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 222 (1992). In this case, petitioners have not shown that their claimed deductions for expenses were made with any significant regard to whether they were personal in nature, and the record supports the inference that petitioners' photography activity was used to deduct personal expenses. For the foregoing reasons, moreover, we do not consider Mr. Storer to have acted reasonably with respect to the deduction of those expenses claimed for his photography activity. Based on our consideration of the entire record, we sustain respondent's determinations with respect to the accuracy-related penalties for negligence for the years in issue.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.